SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Liberty Insurance Corp. v. Techdan, LLC (A-52-21) (086219)**

**Argued October 12, 2022 -- Decided February 15, 2023 -- Revised March 23, 2023**

**PATTERSON, J., writing for the Court.**

In this appeal, the Court considers whether claims brought under the Insurance Fraud Protection Act (IFPA) and the Workers' Compensation Act (WCA) by plaintiffs Liberty Insurance Corp. and LM Insurance Corp. (Liberty) against defendants Techdan, LLC (Techdan), Exterior Erecting Services, Inc. (Exterior), Daniel Fisher, Robert Dunlap, and Carol Junz are subject to the apportionment procedure of the Comparative Negligence Act (CNA). The Court also considers whether it was plain error for the trial court not to give an ultimate outcome charge instructing the jury that if it were to find that a defendant engaged in a pattern of insurance fraud, any award of compensatory damages would be trebled. Finally, the Court considers the appropriate scope of the new trial upon remand.

Liberty issued workers' compensation policies to Techdan from March 2004 to March 2007. It contends, among other allegations, that defendants misrepresented the relationship between Techdan and Exterior and the ownership structure of the two entities and provided fraudulent payroll records to reduce the premiums for workers' compensation insurance. Techdan was indicted for second-degree theft by deception, and Dunlap entered a guilty plea to that charge on Techdan's behalf.

Liberty filed this action, asserting claims against all defendants for fraud under the IFPA, workers' compensation premium fraud under N.J.S.A. 34:15-57.4, and common-law fraud. It also pled claims for breach of contract and civil conspiracy. Liberty demanded compensatory damages, including treble damages pursuant to the IFPA, attorneys' fees and costs, and punitive damages. It asked the court to impose joint and several liability on all defendants for any damages, costs, or fees awarded. Defendants denied liability and pled as an affirmative defense that Liberty's claims were "barred in whole or in part by the doctrine of contribution/ comparative fault."

The court granted partial summary judgment as to Liberty's IFPA claim for insurance fraud against Techdan, Exterior, Dunlap, and Fisher; partial summary judgment as to Liberty's workers' compensation fraud claim against all defendants;

1

and partial summary judgment as to Liberty's breach of contract claim against Techdan and Exterior. The court denied summary judgment as to Liberty's remaining claims. The court granted defendants' motion seeking an ultimate outcome jury charge. That charge would have informed the jury that if it were to find a pattern of fraudulent conduct under N.J.S.A. 17:33A-7(b) against any defendant, any compensatory damages award under the IFPA against that defendant would be trebled.

The case was reassigned to a different judge and was tried before a jury over ten trial days. At trial, no party argued that the jury should allocate fault in accordance with N.J.S.A. 2A:15-5.2(a)(2). Notwithstanding the prior judge's ruling that the jury should be given an ultimate outcome charge, no party asked the trial court to include such a charge. The trial court did not instruct the jury to allocate fault in accordance with the CNA, and it did not issue an ultimate outcome charge.

The jury found Techdan liable for $454,660 in compensatory damages and found Exterior liable for $227,330 in compensatory damages, but awarded no compensatory damages against Dunlap, Fisher, or Junz. It awarded punitive damages in the amount of $200,000 against Dunlap, $10,000 against Fisher, and $45,000 against Junz, but awarded no punitive damages against Techdan or Exterior.

The trial court determined that all defendants should be jointly and severally liable for the total of $756,990 awarded as compensatory damages. The court entered judgment against Fisher, who was not liable for treble damages under the IFPA, in the amount of $756,990. Based on the jury's finding that Techdan, Exterior, Dunlap, and Junz had engaged in a pattern of insurance fraud under the IFPA, the trial court trebled that amount, found those defendants jointly and severally liable for the damages award, and entered judgment against each of those defendants in the amount of $2,270,970. The trial court entered judgment for trebled attorneys' fees in the amount of $2,768,018.01 and trebled costs in the amount of $290,048.61 against Techdan, Exterior, Dunlap, and Junz. The court vacated the jury's award of punitive damages against Dunlap, Fisher, and Junz.

The Appellate Division held that the trial court erred when it imposed joint and several liability on defendants rather than directing the jury to allocate percentages of fault to defendants in accordance with N.J.S.A. 2A:15-5.2(a)(2). The Appellate Division also held that the trial court should have given the jury an ultimate outcome charge that damages awarded for violation of the IFPA would be trebled as to any defendant found to have engaged in a pattern of fraudulent conduct. The Appellate Division concluded that the trial court's cumulative errors warranted a new trial, and it remanded the matter for a new trial as to all issues. The Court denied defendants' petitions for certification, 251 N.J. 32 (2022); 251 N.J. 33 (2022), and granted Liberty's cross-petition, 251 N.J. 41 (2022).

2

**HELD:**  Pursuant to N.J.S.A. 2A:15-5.2(a) and -5.2(d), the trial court should have charged the jury to allocate percentages of fault and should have molded the judgment based on the jury's findings.  The trial court's failure to apply the CNA warrants a new trial on remand so that a new jury may apportion percentages of fault under N.J.S.A. 2A:15-5.2(a)(2).  The Court does not disturb the first jury's findings on the issues of liability under the IFPA, the WCA, or Liberty's common-law claims, or its determination of total compensatory damages.  The Court finds no plain error in the trial court's failure to give the jury an ultimate outcome charge in this complex matter.

1.  The CNA, N.J.S.A. 2A:15-5.1 to -5.8, codifies the principle of comparative negligence, which represents a more just and socially desirable distribution of loss than that ever achieved by the rule of contributory negligence.  When the CNA and the Joint Tortfeasors Contribution Law are applied together, the percentage of a total judgment assessed against a joint tortfeasor is determined not by pro rata allocation of damages, but by the factfinder's determination of the fault of each tortfeasor and, in cases involving contributory negligence, the fault of the plaintiff.  A party whose fault is assessed to be less than 60% cannot be held jointly and severally liable for the entire award of damages.  Nothing in the CNA suggests that a party must request an allocation for the court to conduct such an allocation; to the contrary, the statute's plain language expresses the Legislature's intent that in actions covered by the statute, the factfinder's allocation of fault and the court's molding of the verdict are mandatory.  N.J.S.A. 2A:15-5.2(a), (b), (d).  Contrary to the trial court's ruling in this case, defendants do not need to plead crossclaims against one another for the court to allocate fault.  (pp. 17-19)

2.  The Court discusses the scope of cases to which the CNA applies.  It first applied to "negligence actions," a term undefined in the original statute.  N.J.S.A. 2A:15-5.2 (1973).  Case law and legislative amendments have recognized that the CNA governs a broad range of civil causes of action, including statutory and common-law claims premised on intentional conduct as well as those based on negligence.  See N.J.S.A. 2A:15-5.2(c), -5.3; Blazovic v. Andrich, 124 N.J. 90, 107-08 (1991); Gennari v. Weichert Co. Realtors, 148 N.J. 582, 608-09 (1997).  (pp. 20-23)

3.  The Court reviews the history and relevant provisions of the IFPA, including that treble damages are recovered under N.J.S.A. 17:33A-7(b) if "the defendant has engaged in a pattern of violating" the statute.  The Court also reviews the relevant provisions of the WCA, N.J.S.A. 34:15-57.4(a)(2) and (b).  (pp. 23-27)

4.  In determining whether Liberty's IFPA and WCA workers' compensation fraud claims are subject to the CNA's apportionment procedure, the Court focuses on the "substance of the action and not the conclusory terms used by the parties," as the Legislature prescribed.  N.J.S.A. 2A:15-5.2(c)(1).  After reviewing both claims in

3

detail, the Court concludes that they are among the types of cases to which the CNA applies and that there is no reason to exclude Liberty's IFPA or WCA claims from the allocation-of-fault scheme prescribed by the Legislature in the CNA. Further, Liberty's assertion of a claim for civil conspiracy as one of its common-law causes of action does not change the analysis. Although the Legislature has the authority to amend the CNA to treat civil conspiracy claims differently from other claims, as it has with respect to environmental claims, it has not done so. Liberty's common-law claim for civil conspiracy, like its other claims, is subject to the CNA. Finally, the Court explains why it does not concur with the trial court's conclusion that the CNA is inapplicable to this case because Liberty was not at fault and defendants did not pursue a strategy of blaming one another for Liberty's harm. The Court concurs with the Appellate Division that the trial court erred when it imposed joint and several liability on defendants instead of instructing the jury in accordance with N.J.S.A. 2A:15-5.2(a) and molding the judgment based on the jury's findings in accordance with N.J.S.A. 2A:15-5.2(d). (pp. 27-31)

5. Turning to whether the trial court erred in not giving an ultimate outcome charge, the Court reviews case law examining the purpose of such a charge. In Roman v. Mitchell, a personal injury action tried shortly after the Legislature adopted the CNA, the Court held that "unless the jury is made aware of the legal effect of its findings as to percentages of negligence, such findings may be premised on an erroneous concept of the law and can result in a molded judgment far different from that intended by the jury." 82 N.J. 336, 345 (1980). The Court concluded, however, that "in a complex case involving multiple issues and numerous parties, the trial court, in the exercise of sound discretion, could withhold the instruction if it would tend to mislead or confuse the jury." Id. at 346-47. In Wanetick v. Gateway Mitsubishi, the Court reaffirmed "the important caveat expressed in Roman, namely, that in complex cases involving multiple questions and many parties, the trial court retains its discretion to withhold the instruction if it would tend to confuse or mislead the jury or produce a manifestly unjust result," even though it found that Wanetick itself was not such a case because it was "straightforward" and "relatively uncomplicated" and it involved "a small number of defendants." 163 N.J. 484, 495 (2000). Applying the principles set forth in case law, the Court does not share the Appellate Division's view that the trial court committed reversible error when it declined to give the jury an ultimate outcome charge here. This appeal arises from a complex and lengthy trial in which the jury was compelled to consider multiple statutory and common-law claims against a limited liability company, a corporation, and three individual defendants, and it was within the trial court's discretion to give the jury an ultimate outcome charge, or to decline to do so. (pp. 31-35)

6. Finally, on the issue of remedy, the Court concurs with the Appellate Division that the trial court's judgment gave rise to a miscarriage of justice warranting remand for a new trial, but it does not agree with the appellate court regarding the

4

scope of the new trial on remand. The appropriate remedy here is a retrial in which the trial court will instruct a new jury to allocate percentages of fault under N.J.S.A. 2A:15-5.2(a)(2). The trial court's failure to apply N.J.S.A. 2A:15-5.2(a) and (d) did not affect the integrity of the jury's discrete determinations of liability, including its finding regarding a pattern of insurance fraud under N.J.S.A. 17:33A-7(b), and there is no need to revisit those determinations on remand. Similarly, the trial court should not instruct the jury on remand to redetermine the total amount of compensatory damages. The jury awarded a total of $681,990 in compensatory damages (beyond the $75,000 accounted for in the plea agreement, as explained in the Court's opinion). That total represents the value of insurance premiums that, absent defendants' fraudulent conduct, would have been paid to Liberty. That damages award constitutes a jury's finding of "the full value of the injured party's damages" for purposes of N.J.S.A. 2A:15-5.2(a)(1), and it should not be revisited on remand. The Court provides guidance for the remand proceedings. (pp. 10, 36-39)

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED to the trial court.**

**CHIEF JUSTICE RABNER; JUSTICES SOLOMON, PIERRE-LOUIS and FASCIALE; and JUDGE SABATINO (temporarily assigned) join in JUSTICE PATTERSON's opinion.**

5

Liberty Insurance Corp. and
LM Insurance Group,

Plaintiffs-Appellants,

v.

Techdan, LLC, Exterior Erecting
Services, Inc., Daniel Fisher, Robert
Dunlap, and Carol Junz,

Defendants-Respondents.

On certification to the Superior Court,

Appellate Division.

| Argued | Decided | Revised |
|---|---|---|
| October 12, 2022 | February 15, 2023 | March 23, 2023 |

Anthony J. Golowski, II, argued the cause for appellants
(Goldberg Segalla, attorneys; Anthony J. Golowski, II,
Anita Hotchkiss, and H. Lockwood Miller, III, on the
briefs).

John B. Kearney argued the cause for respondent Carol
Junz (Kearney and Associates, attorneys; Justin T.
Loughry and Lawrence W. Lindsay, on the briefs).

John P. Morris argued the cause for respondents Techdan,
LLC, Exterior Erecting Services, Inc., Daniel Fisher, and
Robert Dunlap (John P. Morris, on the briefs).

Michael A. Malia argued the cause for amicus curiae the Coalition Against Insurance Fraud (Peri & Stewart and McGill and Hall, attorneys; Michael A. Malia and Thomas Hall, on the brief).

Eric S. Poe submitted a brief on behalf of amicus curiae the Citizens United Reciprocal Exchange (Eric S. Poe, of counsel and on the brief, and Abbey True Harris, on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

When it enacted the Insurance Fraud Prevention Act (IFPA), N.J.S.A. 17:33A-1 to -30, "the Legislature created a number of enforcement mechanisms and penalties" to deter and punish insurance fraud. Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 172 (2006). Among other provisions, the IFPA authorizes an insurance company that has been damaged by a violation of the statute to bring a civil action and "to recover compensatory damages, which shall include reasonable investigation expenses, costs of suit and attorneys['] fees" if it prevails. N.J.S.A. 17:33A-7(a). If the plaintiff proves that a defendant has engaged in a "pattern" of fraudulent conduct violating the statute, the court imposes treble damages against that defendant. Id. at -7(b).

In the Workers' Compensation Act (WCA), the Legislature separately prescribed a civil cause of action against a person who purposely or knowingly "[m]akes a false or misleading statement, representation or submission,

2

including a misclassification of employees . . . for the purpose of evading the full payment of . . . premiums" for workers' compensation insurance. N.J.S.A. 34:15-57.4(a)(2), -57.4(b). That WCA provision authorizes an award of attorneys' fees to a prevailing plaintiff. Id. at -57.4(b).

This appeal arises from a judgment entered by the trial court in favor of plaintiffs Liberty Insurance Corp. and LM Insurance Corp. (Liberty) against defendants Techdan, LLC (Techdan), Exterior Erecting Services, Inc. (Exterior), Daniel Fisher, Robert Dunlap, and Carol Junz. In this civil action that followed a criminal prosecution, Liberty asserted statutory claims under the IFPA and WCA and common-law causes of action. Liberty contends that defendants misrepresented Techdan's and Exterior's relationship and ownership structure and underreported the wages of Techdan employees to minimize the premiums Liberty charged for workers' compensation insurance.

Following determinations on summary judgment that Techdan, Exterior, and Dunlap were liable as a matter of law as to some of Liberty's claims, the remaining claims were tried before a jury. The trial court did not charge the jury to allocate percentages of fault to the defendants pursuant to the Comparative Negligence Act (CNA), N.J.S.A. 2A:15-5.1 to -5.8. At trial, no party requested an "ultimate outcome" instruction informing the jury that if it found that a defendant engaged in a pattern of insurance fraud under N.J.S.A.

3

17:33A-7(b), any award of compensatory damages would be trebled, and the trial court did not give such an instruction.

The jury concluded that Liberty proved at least one of its claims against each defendant, and found that Techdan, Exterior, Dunlap, and Junz, but not Fisher, had engaged in a pattern of insurance fraud under N.J.S.A. 17:33A-7(b). It imposed compensatory damages against Techdan and Exterior, but not against Dunlap, Fisher, or Junz. The jury found Dunlap, Fisher, and Junz, but not Techdan or Exterior, liable for punitive damages.

The trial court ruled that all defendants would be jointly and severally liable for the jury's total compensatory damages award, and it imposed on Techdan, Exterior, Dunlap, and Junz joint and several liability for treble damages awarded against them under the IFPA. In post-trial rulings, the trial court rejected defendants' claims that they were entitled to a new trial because the jury was not charged to apportion fault under the CNA or given an ultimate outcome instruction explaining that any damages awarded against a defendant found to have engaged in a pattern of insurance fraud under the IFPA would be trebled by the court.

Defendants appealed, and the Appellate Division reversed the trial court's judgment. The appellate court held that the trial court should have instructed the jury to allocate fault among defendants in accordance with the

4

CNA. The Appellate Division also held that the trial court should have given the jury an ultimate outcome charge when it instructed the jury to determine whether defendants engaged in a pattern of insurance fraud. The appellate court remanded the matter to the trial court for a new trial on all issues.

We affirm in part and reverse in part the Appellate Division's judgment. We concur with the appellate court that pursuant to N.J.S.A. 2A:15-5.2(a) and -5.2(d), the trial court should have charged the jury to allocate percentages of fault and should have molded the judgment based on the jury's findings. We hold that the trial court's failure to apply the CNA warrants a new trial on remand so that a new jury may apportion percentages of fault under N.J.S.A. 2A:15-5.2(a)(2). We do not disturb the first jury's findings on the issues of liability under the IFPA, the WCA, or Liberty's common-law claims, or its determination of total compensatory damages. We find no plain error in the trial court's failure to give the jury an ultimate outcome charge in this complex matter.

## I.

## A.

During the period relevant to this action, Techdan and Exterior were New Jersey entities engaged in the construction of exterior walls for commercial buildings. According to Liberty, Dunlap and Fisher were LLC

members and officers of Techdan; Dunlap was an officer and sole shareholder of Exterior; Fisher held himself out as a part owner of Exterior; and Junz was the controller of both entities, responsible for securing workers' compensation insurance on their behalf.

According to Liberty, Exterior and Techdan agreed to an arrangement whereby Exterior would enter into construction contracts with general contractors and receive the revenue from those contracts. Liberty asserts that Techdan would retain the employees whose labor was needed to satisfy Exterior's contractual obligations, and Exterior would provide the capital to meet Techdan's payroll.

Liberty issued workers' compensation policies to Techdan for the period between March 12, 2004 and March 12, 2007. It contends, among other allegations, that during its underwriting process and in audits, defendants misrepresented the relationship between Techdan and Exterior and the ownership structure of the two entities and provided Liberty's auditors with fraudulent payroll records to reduce the premiums charged by Liberty for workers' compensation insurance.

Following an investigation by the Office of the Insurance Fraud Prosecutor, Techdan was indicted for second-degree theft by deception, N.J.S.A. 2C:20-4. In accordance with a plea agreement, Dunlap entered a

6

guilty plea to that charge on Techdan's behalf. Under the plea agreement, Techdan agreed to pay restitution to Liberty in the amount of $75,000 in stipulated damages, and Dunlap agreed to personally guarantee payment of that amount.

B.

1.

Liberty filed this action, asserting claims against all defendants for fraud under the IFPA, workers' compensation premium fraud under N.J.S.A. 34:15-57.4, and common-law fraud. It also pled claims for breach of contract against Techdan and Exterior and claims for aiding and abetting and civil conspiracy against Dunlap, Fisher, and Junz. Liberty contended that the trial court should pierce Techdan's "corporate veil" and Exterior's "limited liability company veil" to impose personal liability on Dunlap and Fisher. It also sought to impose personal liability on Dunlap and Fisher as officers and directors of Techdan and on Dunlap by virtue of his status as an officer and sole shareholder of Exterior.

Liberty demanded compensatory damages, including damages based on a quantum meruit theory, treble damages pursuant to the IFPA, attorneys' fees and costs, and punitive damages. It asked the court to impose joint and several liability on all defendants for any damages, costs, or fees awarded.

7

Defendants denied liability and pled as an affirmative defense that Liberty's claims were "barred in whole or in part by the doctrine of contribution/comparative fault."

Following discovery, Liberty moved for summary judgment. The court granted in part and denied in part Liberty's motion. It granted partial summary judgment as to Liberty's IFPA claim for insurance fraud against Techdan, Exterior, Dunlap, and Fisher; partial summary judgment as to Liberty's workers' compensation fraud claim against all defendants; and partial summary judgment as to Liberty's breach of contract claim against Techdan and Exterior. The court denied summary judgment with respect to Liberty's remaining claims.

The court granted defendants' motion seeking an ultimate outcome jury charge. That charge would have informed the jury that if it were to find a pattern of fraudulent conduct under N.J.S.A. 17:33A-7(b) against any defendant, any compensatory damages award under the IFPA against that defendant would be trebled.

The case was reassigned to a different judge for trial and was tried before a jury over ten trial days.

Liberty presented fact and expert testimony and documentary evidence regarding Techdan's guilty plea, representations made by defendants in

8

connection with Techdan's application for workers' compensation insurance, representations made in annual audits of Techdan's payroll records, defendants' alleged intent to defraud, the relationship between Techdan and Exterior, and the personal involvement of the three individual defendants in the alleged fraudulent conduct.

Dunlap, Fisher, and Junz testified on their own behalf. They also presented the testimony of a fact witness, as well as documentary evidence regarding the basis for Techdan's calculation of the wage base for its Liberty policies and the origin of documents alleged by Liberty to be fraudulent.

At trial, no party argued that the jury should allocate fault in accordance with N.J.S.A. 2A:15-5.2(a)(2). Notwithstanding the prior judge's ruling that the jury should be given an ultimate outcome charge regarding the trebling of any compensatory damages award under the IFPA, no party asked the trial court to include such a charge in its jury instructions.

The trial court instructed the jury to determine whether Liberty had proven its claims against all defendants for insurance fraud and a pattern of insurance fraud under the IFPA, workers' compensation fraud under the WCA, and common-law fraud; its claims against Techdan and Exterior for breach of contract; its claims against Dunlap, Fisher, and Junz for aiding and abetting and civil conspiracy; and its claims that Dunlap and Fisher should be held

liable based on theories of "piercing the corporate veil" and officers' and directors' liability. The court informed the jury that it had previously held Techdan and Dunlap jointly and severally liable to Liberty for $75,000 in damages stipulated at the time of the guilty plea.[1] It directed the jury to assess compensatory damages, to the extent those damages exceeded the stipulated damages of $75,000, against each defendant found liable, and to consider Liberty's punitive damages claim. The verdict sheet defined compensatory damages as "the amount of lost insurance premiums." The trial court did not instruct the jury to allocate fault in accordance with the CNA, and it did not issue an ultimate outcome charge.

The jury found that Liberty had proven its claims for insurance fraud under the IFPA against Exterior and Junz. It determined that Liberty had proven that Techdan, Exterior, Dunlap, and Junz, but not Fisher, had engaged in a pattern of insurance fraud under N.J.S.A. 17:33A-7(b). The jury also found that Liberty had proven its claims for workers' compensation fraud under the WCA against Exterior, Dunlap, and Junz, but not Fisher. It decided

---

[1] With respect to some of the claims as to which summary judgment was granted to Liberty prior to trial, the verdict sheet contained check marks indicating that specific issues were already decided. The trial court informed the jury that a check mark on the verdict sheet meant that the court "has already decided that particular issue against that particular defendant," and that the jury "must accept that decision."

that Liberty had proven its claim for common-law fraud against all defendants, its claim for aiding and abetting against Dunlap, Fisher, and Junz, its claim for civil conspiracy against Dunlap and Junz, and its claim that Dunlap should be found personally liable based on theories of "piercing the corporate veil" and officers' and directors' liability.

The jury found Techdan liable for $454,660 in compensatory damages and found Exterior liable for $227,330 in compensatory damages, but awarded no compensatory damages against Dunlap, Fisher, or Junz. It awarded punitive damages in the amount of $200,000 against Dunlap, $10,000 against Fisher, and $45,000 against Junz, but awarded no punitive damages against Techdan or Exterior.

The trial court determined that all defendants should be jointly and severally liable for the total of $756,990 awarded as compensatory damages. The court entered judgment against Fisher, who was not liable for treble damages under the IFPA, in the amount of $756,990. Based on the jury's finding that Techdan, Exterior, Dunlap, and Junz had engaged in a pattern of insurance fraud under the IFPA, the trial court trebled that amount, found those defendants jointly and severally liable for the damages award, and entered judgment against each of those defendants in the amount of $2,270,970. The trial court entered judgment for trebled attorneys' fees in the amount of

11

$2,768,018.01 and trebled costs in the amount of $290,048.61 against Techdan, Exterior, Dunlap, and Junz. The court vacated the jury's award of punitive damages against Dunlap, Fisher, and Junz.

In motions for reconsideration under Rule 4:49-2 and for a new trial under Rule 4:49-1, defendants argued that the trial court should have charged the jury to allocate fault under the CNA and should have given an ultimate outcome charge explaining the consequences of a finding that defendants engaged in a pattern of insurance fraud under the IFPA. The trial court held that it was not required to charge the jury to allocate fault or to give an ultimate outcome instruction because there was no evidence that Liberty was at fault, and because defendants did not file crossclaims for contribution or indemnification. It denied defendants' motion for reconsideration and their motion for a new trial.

2.

Defendants appealed the trial court's judgment. The Appellate Division held that the trial court erred when it imposed joint and several liability on defendants rather than directing the jury to allocate percentages of fault to defendants in accordance with N.J.S.A. 2A:15-5.2(a)(2). It noted case law applying the CNA to claims based on intentional torts as well as negligence and strict liability, including statutory fraud claims brought under the

12

Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -227.  The appellate court rejected the trial court's reasoning that the CNA does not govern cases in which the plaintiff is not at fault.  The court viewed the trial court's imposition of joint and several liability on defendants to constitute the assignment of one hundred percent of the liability to a party not determined by the jury to be at least sixty percent at fault, contrary to N.J.S.A. 2A:15-5.3(c).  It held that the trial court had substituted its judgment for that of the jury.

The Appellate Division also held that the trial court should have given the jury an ultimate outcome charge informing the jury that damages awarded for violation of the IFPA would be trebled as to any defendant found to have engaged in a pattern of fraudulent conduct.

The Appellate Division concluded that although defendants did not raise the CNA or ultimate outcome issues until they filed their motion for reconsideration, the trial court's cumulative errors gave rise to a miscarriage of justice, warranting a new trial under Rule 4:49-1.  It remanded the matter to the trial court for a new trial as to all issues.

## C.

Defendants filed petitions for certification, and Liberty filed a cross-petition for certification.  We denied defendants' petitions for certification. 251 N.J. 32 (2022); 251 N.J. 33 (2022).  We granted Liberty's cross-petition

for certification. 251 N.J. 41 (2022). We granted the applications of the Coalition Against Insurance Fraud (CAIF) and Citizens United Reciprocal Exchange (CURE) to appear as amici curiae.

## II.

### A.

Liberty argues that the Appellate Division improperly held that all the claims asserted in this case are subject to the CNA. It asserts that the Legislature's plain language and objective in enacting the IFPA is undermined if courts do not hold individuals and entities who have committed insurance fraud jointly and severally liable. Liberty contends that there was no reason for the trial court to direct the jury to allocate fault under the CNA because defendants did not assert crossclaims or seek an allocation of a percentage of fault against one another. It argues that the trial court properly declined to give an ultimate outcome charge given the complexity of the trial. Liberty asserts that if the Court determines that the CNA should apply and orders a new trial on remand, that trial should be limited to the allocation of damages on claims as to which the defendants are not subject to joint and several liability.

B.

Defendants assert that the Appellate Division's judgment should be affirmed. They contend that the trial court improperly substituted its judgment for the allocation of fault that the jury should have been charged to conduct, and that the appellate court properly found that the CNA governs all claims asserted in this case. Defendants view the jury's determination of damages to reflect its intent to apportion the verdict among the defendants. They argue that the trial court should have given an ultimate outcome charge so that the jury would understand the IFPA's potential impact on an award of damages.

C.

Amicus curiae CAIF argues that the Appellate Division's determination that a jury should apportion fault for an IFPA claim contravened the Legislature's intent to combat insurance fraud, failed to consider Liberty's civil conspiracy claim, and invited a jury to reduce the damages recovered by a defrauded insurer. It asserts that even if the CNA requires allocation of compensatory damages among defendants, the trial court's award of attorneys' fees should not be apportioned.

D.

Amicus curiae CURE contends that the apportionment of fault to parties in an action brought under the IFPA undermines the Legislature's goal in

enacting the statute. It asserts that the Appellate Division incorrectly ruled that the trial court should have given an ultimate outcome charge in this complex matter.

## III.

### A.

"The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge . . . ." Risko v. Thompson Muller Auto Grp., Inc., 206 N.J. 506, 522 (2011). "Thus, to determine whether the [defendant] is entitled to a new trial based on the record before us, we consider whether denying a new trial 'would result in a miscarriage of justice shocking to the conscience of the court.'" Township of Manalapan v. Gentile, 242 N.J. 295, 305 (2020) (quoting Risko, 206 N.J. at 521).

We review the Appellate Division's determination that Liberty's IFPA claim, its WCA claim for insurance fraud, and its common-law claims for fraud and civil conspiracy were subject to the CNA. Because the Appellate Division's interpretation of the CNA was a legal determination, our review on that question is de novo. Cashin v. Bello, 223 N.J. 328, 335 (2015); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

When we construe a statute, discerning the Legislature's intent is "the paramount goal," and "the best indicator of that intent is the statutory

16

language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). We look to "the statute's plain language, giving words 'their ordinary meaning and significance.'" State v. Rangel, 213 N.J. 500, 509 (2013) (quoting DiProspero, 183 N.J. at 492). When two or more statutory schemes are analyzed, they "should be read in pari materia and construed together as a unitary and harmonious whole." State v. Nance, 228 N.J. 378, 395 (2017) (quoting Nw. Bergen Cnty. Utils. Auth. v. Donovan, 226 N.J. 432, 444 (2016)). "The Legislature is presumed to be familiar with its own enactments, with judicial declarations relating to them, and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose." State v. Federanko, 26 N.J. 119, 129 (1958).

## B.

### 1.

The CNA codifies the principle of comparative negligence, which "represents a more just and socially desirable distribution of loss than that ever achieved by the application of the long-standing rule of contributory negligence." Blazovic v. Andrich, 124 N.J. 90, 97 (1991) (quoting O'Brien v. Bethlehem Steel Corp., 59 N.J. 114, 126 (1971) (Francis, J., concurring)).

Along with the Joint Tortfeasors Contribution Law (JTCL), N.J.S.A. 2A:53A-1 to -5, which affords contribution rights to joint tortfeasors, the CNA

prescribes "the statutory framework for the allocation of fault when multiple parties are alleged to have contributed to the plaintiff's harm." Town of Kearny v. Brandt, 214 N.J. 76, 96 (2013). The statutes together enable "'the distribution of loss in proportion to the respective faults of the parties causing that loss'" and "ensure that damages are ordinarily apportioned to joint tortfeasors in conformity to the factfinder's allocation of fault." Jones v. Morey's Pier, Inc., 230 N.J. 142, 160 (2017) (quoting Brandt, 214 N.J. at 102). When the two statutes are applied together, "the percentage of a total judgment assessed against a joint tortfeasor is determined not by pro rata allocation of damages, but by the factfinder's determination of the fault of each tortfeasor and, in cases involving contributory negligence, the fault of the plaintiff." Glassman v. Friedel, 249 N.J. 199, 219-20 (2021).

Under the CNA, the court instructs the factfinder to make the following findings:

> (1) The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence or fault, that is, the full value of the injured party's damages.
>
> (2) The extent, in the form of a percentage, of each party's negligence or fault. The percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%.
>
> [N.J.S.A. 2A:15-5.2(a).]

18

The trial court "shall mold the judgment from the findings of fact made by the trier of fact." Id. at -5.2(d).

In the CNA, the Legislature authorized the imposition of joint and several liability only on defendants determined by the factfinder to be sixty percent or more responsible for the plaintiff's harm. A plaintiff may recover "[t]he full amount of the damages from any party determined by the trier of fact to be 60% or more responsible for the total damages." Id. at -5.3(a). Under N.J.S.A. 2A:15-5.3(c), however, the plaintiff may recover "[o]nly that percentage of the damages directly attributable to that party's negligence or fault from any party determined by the trier of fact to be less than 60% responsible for the total damages." Accordingly, under the CNA, a party whose fault is assessed by the factfinder to be less than sixty percent cannot be held jointly and severally liable for the entire award of damages. Ibid.

Nothing in the CNA suggests that a party must request an allocation under its terms for the court to conduct such an allocation; to the contrary, the statute's plain language expresses the Legislature's intent that in actions covered by the statute, the factfinder's allocation of fault and the court's molding of the verdict are mandatory. See id. at -5.2(a), (b), (d). Contrary to the trial court's ruling in this case, defendants do not need to plead crossclaims against one another for the court to allocate fault.

19

## 2.

As enacted in 1973, the CNA applied to "negligence actions," a term undefined in the original version of the statute. N.J.S.A. 2A:15-5.2 (1973). That statutory language has long been construed to govern claims that do not strictly conform to that description. In Suter v. San Angelo Foundry & Machine Co., a strict liability action, we held that the statute "was intended to cover fault in a broader sense rather than in the narrow negligence concept." 81 N.J. 150, 161 n.2 (1979); see also Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 292-96 (1990) (applying the CNA's allocation-of-fault procedure to the plaintiff, to defendants alleged to be negligent, and to defendants alleged to be strictly liable); Cartel Capital Corp. v. Fireco of N.J., 81 N.J. 548, 566-68 (1980) (allocating fault under the CNA to both a defendant alleged to be negligent and a defendant alleged to be strictly liable).

In Blazovic, we applied the CNA's apportionment scheme in a case arising from an altercation in the parking lot of a restaurant in which the plaintiff was assaulted and injured. 124 N.J. at 93-94. There, the plaintiff asserted negligence claims against one group of defendants and claims for intentional and negligent conduct against a second category of defendants. Id. at 94. We rejected the contention that under the CNA, "intentional conduct is 'different in kind' from both negligence and wanton and willful conduct, and

20

consequently cannot be compared with them." Id. at 107. We held instead that, "consistent with the evolution of comparative negligence and joint-tortfeasor liability in this state," responsibility for the plaintiff's injury should "be apportioned according to each party's relative degree of fault, including the fault attributable to an intentional tortfeasor." Ibid. We viewed such allocation to fairly apportion a damages award and to be consistent with the deterrent goals of tort law. Id. at 108.

Following Blazovic, the Legislature did not amend the CNA to reject the holding of that decision. Instead, in its 1995 amendments to several provisions of the statute, the Legislature clarified that the CNA governs a broad range of civil actions. L. 1995, c. 140. As amended, the CNA identifies two categories of actions that it governs: "all negligence actions and strict liability actions in which the question of liability is in dispute." N.J.S.A. 2A:15-5.2(a). It defines "negligence actions" to include, but not be "limited to, civil actions for damages based upon theories of negligence, products liability, professional malpractice whether couched in terms of contract or tort and like theories." N.J.S.A. 2A:15-5.2(c)(1).[2] The Legislature instructed a court determining

_____

[2] The Legislature treats environmental actions as a distinct category of claims exempt from the general allocation procedure under N.J.S.A. 2A:15-5.2(a), and the CNA contains provisions that apply solely to such actions. See N.J.S.A. 2A:15-5.3(d), (f); id. at -5.4.

21

whether the CNA applies to a given case to "look to the substance of the action and not the conclusory terms used by the parties." Ibid.

Applying the CNA as amended in 1995, we held in Gennari v. Weichert Co. Realtors that compensatory damages awarded and trebled pursuant to the CFA should be allocated pursuant to the CNA. 148 N.J. 582, 608-09 (1997). In Gennari, we rejected the Appellate Division's holding that the defendant real estate agency should be solely liable for the trebled damages recovered by the plaintiff pursuant to the CFA, and that the agency's only recourse was a potential claim for indemnification against the defendant builder, who was judgment-proof. Id. at 609. Construing the CFA and the CNA together, we held that "the Legislature did not intend that a party in the posture of [the real estate agency] should bear the full weight of the treble damages," but rather envisioned that "'parties causing an injury should be liable in proportion to their relative fault.'" Ibid. (quoting Blazovic, 124 N.J. at 110).

Accordingly, we held in Gennari that in a damages trial on remand, "the trial court should determine damages under N.J.S.A. 2A:15-5.1, apportioning a percentage of fault to each culpable party," that the defendant real estate agency should be liable for the entire award of treble damages only if found to bear more than sixty percent of the fault in accordance with N.J.S.A. 2A:15-5.3(a), and that if the agency were assessed sixty percent or less of the fault, it

22

"would be liable only for the percentage of the treble damages that comport with its percentage of fault." Ibid.; see also Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 88-90 (App. Div. 2013) (holding that damages were subject to apportionment under the CNA in a construction defect case in which the plaintiff asserted claims under the CFA as well as common-law fraud).

The CNA thus governs a broad range of civil causes of action, including statutory and common-law claims premised on intentional conduct as well as those based on negligence. See N.J.S.A. 2A:15-5.2(c), -5.3; Blazovic, 124 N.J. at 107-08; Gennari, 148 N.J. at 608-09.

## C.

### 1.

Against that backdrop, we consider Liberty's contention that a trial court should not charge a jury to apportion fault under N.J.S.A. 2A:15-5.2(a)(2) in a case involving IFPA and WCA insurance fraud claims and should instead impose joint and several liability on all defendants found liable under either statute.

### 2.

The Legislature enacted the IFPA in 1983 "to confront aggressively" insurance fraud in New Jersey "by facilitating the detection of insurance fraud,

23

eliminating the occurrence of such fraud through the development of fraud prevention programs, requiring the restitution of fraudulently obtained insurance benefits, and reducing the amount of premium dollars used to pay fraudulent claims." N.J.S.A. 17:33A-2. The IFPA "is a comprehensive statute designed to help remedy high insurance premiums which the Legislature deemed to be a significant problem." Land, 186 N.J. at 172 (quoting State v. Sailor, 355 N.J. Super. 315, 319 (App. Div. 2001)).

The "IFPA interdicts a broad range of fraudulent conduct." Ibid. One category of prohibited conduct is addressed in N.J.S.A. 17:33A-4(a)(4)(b), which provides that "[a] person or practitioner violates" the IFPA if that person "[p]repares or makes any written or oral statement, intended to be presented to any insurance company or producer for the purpose of obtaining . . . an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to an insurance application or contract."[3] The Legislature further provided that a person or

_____

[3] The IFPA also prohibits a person from making certain statements in support of or in opposition to insurance claims "knowing that the statement contains any false or misleading information concerning any factor or thing material to the claim," N.J.S.A. 17:33A-4(a)(1), -4(a)(2); concealing or knowingly failing to disclose information concerning "any person's initial or continued right or entitlement to" a benefit, id. at -4(a)(3); preparing or making "any written or oral statement, intended to be presented to any insurance company or producer for the purpose of obtaining . . . a motor vehicle insurance policy, that the person to be insured maintains a principal residence in this State when, in fact,

24

practitioner violates the IFPA "if he knowingly assists, conspires with, or urges any person or practitioner to violate" any IFPA provision, N.J.S.A. 17:33A-4(b), or "if, due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act," id. at -4(c).

As a remedy for an IFPA violation, the statute authorizes the Commissioner of Banking and Insurance to bring civil actions or levy civil administrative penalties and order restitution pursuant to N.J.S.A. 17:33A-5. The statute also allows "[a]ny insurance company damaged as a result" of such a violation to "sue therefor in any court of competent jurisdiction to recover compensatory damages, which shall include reasonable investigation expenses, costs of suit and attorneys['] fees." Id. at -7(a). In such an action, the insurance company must prove its claim by a preponderance of the evidence. Land, 186 N.J. at 178-80.

A successful claimant in a civil action under the IFPA "shall recover treble damages if the court determines that the defendant has engaged in a pattern of violating" the statute. N.J.S.A. 17:33A-7(b). For purposes of that

that person's principal residence is" elsewhere, id. at -4(a)(4)(a); and concealing or knowingly failing to disclose "any evidence, written or oral, which may be relevant to a finding that a violation [of N.J.S.A. 17:33A-4(a)(4)] has or has not occurred," id. at -4(a)(5).

25

provision, a "pattern" is defined as "five or more related violations" of the IFPA. Id. at -3. "Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating" the statute. Ibid.

Because the IFPA is remedial legislation, "we must construe the Act's provisions liberally to accomplish the Legislature's broad remedial goals." Land, 186 N.J. at 173.

3.

Under the WCA, a person who purposely or knowingly "[m]akes a false or misleading statement, representation or submission, including a misclassification of employees" for the purpose of evading the full payment of workers' compensation insurance premiums is guilty of a fourth-degree offense. N.J.S.A. 34:15-57.4(a)(2). The statute further provides that

> [a]ny person who wrongfully . . . evades the full payment of . . . premiums by means of a violation of the provisions of [N.J.S.A. 34:15-57(a)] shall be civilly liable to any person injured by the violation for damages and all reasonable costs and attorney fees of the injured person.
>
> [Id. at -57.4(b).]

"Notwithstanding any other provision of law, and in addition to any other remedy available under law, a person who evades the full payment of"

workers' compensation premiums "is liable to pay the sum due and owing plus simple interest." Id. at -57.4(c)(3).

We afford the WCA "'liberal construction in order that its beneficent purposes may be accomplished.'" Estate of Kotsovska v. Liebman, 221 N.J. 568, 584 (2015) (quoting Cruz v. Cent. Jersey Landscaping, Inc., 195 N.J. 33, 42 (2008)).

4.

We consider the core question raised by this appeal: whether Liberty's IFPA and WCA workers' compensation fraud claims are subject to the CNA's apportionment procedure. In that inquiry, we focus on the "substance of the action and not the conclusory terms used by the parties," as the Legislature prescribed. N.J.S.A. 2A:15-5.2(c)(1).

In its IFPA claim, Liberty contends that it suffered damages because defendants made false and misleading statements within the meaning of N.J.S.A. 17:33A-3 in connection with Techdan's application for workers' compensation insurance and in subsequent communications regarding that insurance. The IFPA claim asserted in this case is a statutory fraud claim premised on intentional conduct, and it thus falls within the Legislature's broad definition of "negligence actions" in N.J.S.A. 2A:15-5.2(c)(1). See N.J.S.A. 17:33A-4 (enumerating acts that violate the IFPA); Blazovic, 124 N.J.

27

at 107-08 (construing the CNA to apply to intentional torts). Indeed, Liberty's IFPA claim is closely analogous to the CFA claim addressed in Gennari, 148 N.J. at 608-09; both are remedial statutes that combat fraud with provisions for awards of treble damages and attorneys' fees. See Land, 186 N.J. at 176 (observing that "[t]he closest statutory analogue to IFPA in New Jersey" is the CFA).

Like Liberty's IFPA claim, its WCA claim is premised on defendants' alleged false and misleading statements regarding Techdan's workers' compensation insurance; it is a fraud claim in which attorneys' fees may be awarded to a successful claimant. See N.J.S.A. 34:15-57.4. Liberty's claim for workers' compensation fraud thus falls under the category of intentional torts that we viewed the CNA to encompass when we decided Blazovic, 124 N.J. at 107-08, and Gennari, 148 N.J. at. 608-09.

Nothing in the IFPA or the WCA's fraud provision suggests that the Legislature intended to exempt statutory fraud claims from the CNA or to modify the statute's allocation-of-fault procedure in such cases. See N.J.S.A. 2A:15-5.2, -5.3. Nor is the Legislature's intent in enacting the IFPA and the WCA's fraud provision -- to combat insurance fraud -- incompatible with the CNA, which was enacted to allocate the burden of a judgment in accordance with the relative fault of the parties. There is no reason to exclude Liberty's

28

IFPA or WCA claims from the allocation-of-fault scheme prescribed by the Legislature in the CNA.

Liberty's assertion of a claim for civil conspiracy as one of its common-law causes of action does not change the analysis; nothing in the CNA or its legislative history indicates that the Legislature intended to exclude cases involving allegations of conspiracy from the reach of the CNA.[4] Nor does our case law exclude parties found liable for civil conspiracy from an allocation of fault under the statute.[5] Although the Legislature has the authority to amend

---

[4] The initial version of the 1995 amendments to the CNA would have exempted tortious conduct committed in concert by multiple defendants from the factfinder's apportionment of fault under the CNA. It included a provision that "[t]he liability of two or more defendants shall not be determined on the basis of joint and several liability unless the defendants, acting in concert, caused the injury to the claimant," S.1494 § 2(c) (introduced Oct. 3, 1994), and defined "acting in concert" to denote a setting in which "two or more person[s] agreed to jointly participate in conduct with the actual knowledge of the wrongfulness of the conduct," id. § 2(f)(1) (emphasis added). That language notably did not appear in the amendments to the CNA adopted by the Legislature. See L. 1995, c. 140.

[5] Liberty's reliance on Banco Popular North America v. Gandi, 184 N.J. 161 (2005), is misplaced. There, we observed that "[c]ivil conspirators are jointly liable for the underlying wrong and resulting damages," thus confirming that a defendant found liable for civil conspiracy and a defendant found liable for the substantive cause of action are joint tortfeasors. Id. at 178. The fact that civil conspirators are joint tortfeasors does not exclude them from the CNA; to the contrary, the CNA mandates allocation of fault among joint tortfeasors, preserving their contribution rights against one another. See N.J.S.A. 2A:15-5.2, -5.3; Glassman, 249 N.J. at 220 (noting the CNA's procedure for apportioning fault among joint tortfeasors); Jones, 230 N.J. at 160 (same).

the CNA to treat civil conspiracy claims differently from other claims, as it has with respect to environmental claims, it has not done so. Liberty's common-law claim for civil conspiracy, like its other claims, is subject to the CNA.

Finally, we do not concur with the trial court's conclusion that the CNA is inapplicable to this case because Liberty was not at fault and defendants did not pursue a strategy of blaming one another for Liberty's harm. Nothing in the CNA's plain language suggests that the statute's allocation-of-fault procedure applies only to cases in which the plaintiff bears part of the responsibility for the damages it has sustained. See N.J.S.A. 2A:15-5.2(a), -5.3(a), -5.3(c). In fact, the statute "modifies the pro rata scheme of the [JTCL] irrespective of whether any percentage of negligence is assigned to plaintiff." Lee's Hawaiian Islanders, Inc. v. Safety First Prods., Inc., 195 N.J. Super. 493, 505 (App. Div. 1984); see also Glassman, 249 N.J. at 219-20 (noting that if the plaintiff's contributory negligence is not at issue, the factfinder assesses the fault of each tortfeasor under the CNA). Nor is the CNA limited to settings in which a defendant takes the position that another defendant is responsible for all or part of the plaintiff's harm, as the statute's expansive language confirms. See N.J.S.A. 2A:15-5.2(c), -5.3.

---

Nothing in Gandi suggests that civil conspiracy claims are somehow exempt from the CNA. See 184 N.J. at 172-86.

We therefore concur with the Appellate Division that the trial court erred when it imposed joint and several liability on defendants instead of instructing the jury in accordance with N.J.S.A. 2A:15-5.2(a) and molding the judgment based on the jury's findings in accordance with N.J.S.A. 2A:15-5.2(d).[6]

IV.

A.

No defendant objected to the trial court's failure to give an ultimate outcome charge instructing the jury that if it were to find that a defendant engaged in a pattern of insurance fraud under N.J.S.A. 17:33A-7(b), any award of compensatory damages would be trebled. Accordingly, we review the trial court's failure to give such a charge for plain error. See R. 2:10-2 (providing that "the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court").

---

[6] Amicus curiae CAIF argues that if compensatory damages awarded under the IFPA are subject to allocation under the CNA, the trial court should nonetheless impose joint and several liability on defendants for any award of attorneys' fees and costs. No party urged the Court to make that distinction, and accordingly we do not address it. See In re Request to Modify Prison Sentences, 242 N.J. 357, 395-96 (2020) (noting that we ordinarily do not decide an issue raised only by an amicus curiae and not by a party). On remand, the parties may raise before the trial court arguments regarding the allocation of an award of attorneys' fees and costs.

31

We explained the purpose of an ultimate outcome charge in Roman v. Mitchell, a personal injury action tried shortly after the Legislature adopted the CNA. 82 N.J. 336, 342 (1980). In Roman, counsel for the plaintiff asked the court to instruct the jury that, for the plaintiff to recover, "the jury would have to find that the defendant's percentage of negligence was greater than that of the plaintiff, and that the damages awardable to the [plaintiff] must be diminished in proportion to the amount of negligence attributable to [the plaintiff]." Id. at 342-43. The trial court denied the request, the jury allocated seventy-five percent of the fault to the plaintiff, and the trial court entered judgment for the defendant pursuant to N.J.S.A. 2A:15-5.2(c). Id. at 343. The Appellate Division affirmed the trial court's judgment. Ibid.

Reversing the Appellate Division's determination, we agreed with the plaintiff's contention that "unless the jury is made aware of the legal effect of its findings as to percentages of negligence, such findings may be premised on an erroneous concept of the law and can result in a molded judgment far different from that intended by the jury." Id. at 345. We concluded that

> ordinarily, a jury informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial is better able to fulfill its fact finding function. Hereafter, an ultimate outcome instruction should be given to a jury in such a trial. However, in a complex case involving multiple issues

and numerous parties, the trial court, in the exercise of sound discretion, could withhold the instruction if it would tend to mislead or confuse the jury.

[Id. at 346-47.]

We have addressed ultimate outcome charges beyond the negligence setting of Roman. Our decision in Fischer v. Canario, 143 N.J. 235 (1996), arose from a medical malpractice trial governed by the lost chance of recovery damages apportionment principles announced in Scafidi v. Seiler, 119 N.J. 93, 115 (1990). In Fischer, we held that to avoid juror confusion, the jury should have been instructed that any award of damages "would be reduced by the court to reflect the value of the lost chance" of recovery. 143 N.J. at 254-55.

In Weiss v. Goldfarb, however, we rejected an ultimate outcome charge that would inform the jury of a statutory cap limiting the damages that could be imposed on a nonprofit hospital pursuant to the Charitable Immunity Act, N.J.S.A. 2A:53A-8. 154 N.J. 468, 481-82 (1998). We concluded "that the prejudicial effect of such an instruction could be to shift to other defendants some percentage of negligence that the jury thought should rightfully be assessed against the hospital." Id. at 481. And in Brodsky v. Grinnell Haulers, Inc., we held that it was error for a trial court to give an ultimate outcome charge advising a jury that if it allocated sixty percent or more of the fault to a defendant, that defendant would be liable to the plaintiff for the total amount

33

of the award. 181 N.J. 102, 118-22 (2004). We viewed that charge to be "'irrelevant' to the jury's function of apportioning percentages of fault and determining damages[] and . . . 'highly prejudicial' to defendants." Id. at 122 (quoting Weiss, 154 N.J. at 481).

In the decision most closely analogous to this appeal, Wanetick v. Gateway Mitsubishi, we considered an ultimate outcome charge advising the jury, in keeping with N.J.S.A. 56:8-19, that any award of compensatory damages under the CFA would be trebled and attorneys' fees would be awarded. 163 N.J. 484, 487 (2000). There, we reasoned that "informing jurors about the trebling of damages and the awarding of counsel fees should not result in the impermissible shifting of liability from one defendant to another, the principal concern identified in Weiss." Id. at 494. We held that "jurors sitting in a consumer-fraud case should be informed of the legal effect of their actions so that their deliberations 'will not be had in a vacuum, or possibly based on a mistaken notion of how the statute operates.'" Ibid. (quoting Roman, 82 N.J. at 345). We found "no compelling policy reason to justify shielding jurors from the consequences of their own actions in the jury box." Id. at 494-95.

Nonetheless, we reaffirmed in Wanetick "the important caveat expressed in Roman, namely, that in complex cases involving multiple questions and

34

many parties, the trial court retains its discretion to withhold the instruction if it would tend to confuse or mislead the jury or produce a manifestly unjust result." Id. at 495. We did not view Wanetick to be such a case; instead, we considered it to be "straightforward" and "relatively uncomplicated," and noted that it involved "a small number of defendants." Ibid. Accordingly, we held that an ultimate outcome charge would be appropriate in the setting of that appeal. Ibid.

C.

Applying the principles set forth in our case law, we do not share the Appellate Division's view that the trial court committed reversible error when it declined to give the jury an ultimate outcome charge here. This appeal arises from a complex and lengthy trial in which the jury was compelled to consider multiple statutory and common-law claims against a limited liability company, a corporation, and three individual defendants. In that setting, it was within the trial court's discretion to give the jury an ultimate outcome charge, or to decline to do so. See ibid.

Accordingly, the trial court's decision not to give an ultimate outcome charge did not constitute plain error. See R. 2:10-2.

Finally, we consider the remedy required by the trial court's failure to follow the procedure mandated by the CNA.

We concur with the Appellate Division that the trial court's judgment gave rise to a miscarriage of justice under Rule 4:49-1, warranting remand for a new trial. We do not agree with the appellate court, however, regarding the scope of the new trial on remand. We view the appropriate remedy to be a retrial in which the trial court will instruct a new jury to allocate percentages of fault under N.J.S.A. 2A:15-5.2(a)(2). See Maison v. N.J. Transit Corp., 245 N.J. 270, 309 (2021) ("[A] prior jury has already returned a valid damages award, so the new jury need only allocate fault between the tortfeasors."); Brodsky, 181 N.J. at 122, 128 (remanding for "a new trial on the allocation of fault between" the defendants remaining in the case and a defendant dismissed from the case due to a bankruptcy discharge, but "leav[ing] untouched the jury's award of damages").

Here, the trial court's failure to apply N.J.S.A. 2A:15-5.2(a) and (d) did not affect the integrity of the jury's discrete determinations of liability, including its finding regarding a pattern of insurance fraud under N.J.S.A. 17:33A-7(b). In each instance, the jury found the elements of a given claim to be established under the applicable burden of proof in accordance with the trial

court's instructions. There is no need to revisit those determinations on remand.

Similarly, the trial court should not instruct the jury on remand to redetermine the total amount of compensatory damages. The jury awarded a total of $681,990 in compensatory damages, representing the value of insurance premiums that, absent defendants' fraudulent conduct, would have been paid to Liberty.[7] That damages award constitutes a jury's finding of "the full value of the injured party's damages" for purposes of N.J.S.A. 2A:15-5.2(a)(1), and it should not be revisited on remand. The trial court should not disclose to the jury the amount of compensatory damages awarded by the first jury. See Maison v. N.J. Transit Corp., 245 N.J. 270, 309 (2021) (affirming the Appellate Division's "determination that the damages award should stand and that the new jury should not be informed about the amount of the

---

[7] As the verdict sheet made clear, the jury's award of $681,990 in compensatory damages was in addition to stipulated damages in the amount of $75,000 awarded to Liberty against Techdan, subject to Dunlap's personal guarantee, as part of Techdan's guilty plea. No defendant other than Techdan and Dunlap is liable for the $75,000 in stipulated damages. Accordingly, that amount should be excluded from the total compensatory damages allocated among the defendants pursuant to N.J.S.A. 2A:15-5.2. For purposes of the trial court's molding of the judgment, the compensatory damages award is $681,990.

37

award").[8]  In addition, the new jury will not be bound by or informed of the first jury's decision not to impose compensatory damages on Dunlap, Fisher, or Junz.

On remand, the trial court should instruct the jury to determine, for each defendant, the percentage of the total fault allocated to that defendant, with the total fault of all defendants adding up to one hundred percent.  See N.J.S.A. 2A:15-5.2(a)(2).  The court should then mold the judgment based on the jury's findings in accordance with N.J.S.A. 2A:15-5.2(d), trebling any portion of the compensatory damages award that the jury allocates to defendants Techdan, Exterior, Dunlap, and Junz, who were found to have engaged in a pattern of insurance fraud under the IFPA.  See N.J.S.A. 17:33A-7(b).  The trial court shall address anew Liberty's claim for an award of counsel fees and costs.

We recognize that our decision requires the parties to present a substantial portion of the evidence presented in the first trial so that the jury in

---

[8]  The Appellate Division did not reinstate the jury's punitive damages award, but inferred that Liberty could seek punitive damages on remand; it cautioned the trial court not to charge the new jury as to punitive damages until after that jury's return of a verdict on liability and compensatory damages.  In its cross-petition, Liberty sought reinstatement of the trial court's judgment, which did not include an award of punitive damages, even though the jury had awarded such damages against Dunlap, Fisher, and Junz.  Accordingly, the issue of punitive damages is not before us.  We leave to the trial court the question whether Liberty is entitled to seek an award of punitive damages against any defendant during the proceedings on remand.

the retrial is in a position to assess the fault of each defendant.  We encourage the parties to streamline the trial to the extent practicable by stipulations of fact as to issues that are not in dispute.

## VI.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter is remanded to the trial court for further proceedings in accordance with this opinion.

CHIEF JUSTICE RABNER; JUSTICES SOLOMON, PIERRE-LOUIS and FASCIALE; and JUDGE SABATINO (temporarily assigned) join in JUSTICE PATTERSON's opinion.